IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

(1) **GENEVA JANWAY as Personal Representative of the ESTATE OF AARON JANWAY,**

**Plaintiff,**

vs.

(1) **BOARD OF COUNTY COMMISSIONERS OF LEFLORE COUNTY,**
(2) **LEFLORE COUNTY DETENTION CENTER PUBLIC TRUST,**
(3) **RODNEY DERRYBERRY** individually and in his official capacity,
(4) **JAMES MELSON,** individually and in his official capacity,
(5) **STIGLER HEALTH AND WELLNESS CENTER, INC.,**
(6) **HEALTH & WELLNESS CENTER, INC.,**
(7) **LAURA DEIHL,**
(8) **CHRISTIAN CASE,**
(9) **MICHAEL TOMLIN,**
(10)    **RICK LNU,**
(11) **TY HASTING,**
(12) **KRISTINA LYONS, and,**
(13) **ROBYN LAUGHLIN.**

**Defendants.**

Case No.:   23-CV-335-GLJ

**ATTORNEY LIEN CLAIMED**

## COMPLAINT

COMES NOW, Geneva Janway, as Personal Representative of the Estate of Aaron Janway, for her causes of action against the Board of County Commissioners of Leflore County ("County"), Leflore County Detention Center Public Trust ("Trust"), Rodney Derryberry ("Derryberry"),

individually and in his official capacity, James Melson ("Melson"), individually and in his official capacity, Stigler Health and Wellness Center, Inc. ("Stigler"), Health & Wellness Center, Inc. ("Health"), Laura Deihl ("Deihl"), Christian Case ("Case"), Michael Tomlin ("Tomlin", Rick Lnu ("Lnu"), Ty Hasting ("Hasting"), Kristina Lyons ("Lyons"), and Robyn Laughlin ("Laughlin"), alleges and states as follows:

## **INTRODUCTORY STATEMENT**

1.      Aaron Janway ("Janway") was booked into the Leflore County Detention Center ("LCDC") on October 3, 2021.

2.      During Janway's detention, he notified LCDC jailers and medical personnel employed by Stigler and/or Health of his serious medical and mental health conditions – including mental llnesses, such as bipolar and depression, cognitive disabilities and delays, hypertension and other cardiovascular risks – that required daily monitoring as well as daily medication

3.      Janway submitted requests for medically necessary treatment and medication while housed in the LCDC's high risk cells. In keeping with the LCDC's unconstitutional medical care policies and customs, Janway did not receive his medication and his blood pressure was not monitored, which resulted in the Plaintiff suffering extreme and obvious physical and mental decline, cardiovascular crisis and a heart attack.

4.      As a result of the Defendant's deliberate disregard to Janway's medical needs, Janway's health showed serious and obvious decline. Janway suffered numerous seizures. Janway could not walk or stand. Janway was unable to eat and repeatedly vomited and defecated on himself. Janway notified medical detention staff of his deteriorating condition. However, no one at the Jail did anything to assist Janway. Defendants put Janway in a suicide smock (which Defendants referred to as a "turtle suit") but otherwise failed to monitor Janway or provide any mental health evaluation or treatment.

5.      Instead of providing Janway with necessary medical treatment, Defendants told Janway that he was faking his conditions. Defendant berated Janway, verbally assaulting him for his cognitive delays, mental health issues, and obesity. Defendants used excessive force against Janway, dragging him across the floor by his feet because he was unable to walk. Defendants placed Janway in an extremely cold shower in order to punish him for "faking" his health conditions. While putting Janway in the cold shower, Defendants used excessive force against Janway, slamming his head against the tile wall of the shower. Janway was in such poor condition, he was unable to leave the shower despite its extreme temperatures. Instead, he lay on the floor for more than twenty minutes. During this time, Janway suffered a heart attack and lost consciousness.

6.      Defendants were deliberately indifferent to Janway's serious medical and mental health needs and safety. As a result of this indifference, Janway suffered significant injuries, both physical and emotional.

7.      Unfortunately, Janway's mistreatment was not an isolated occurrence. There is a well-established, well-documented and prevailing attitude of indifference to the health and safety of inmates at the LCDC. Even after multiple preventable deaths and negative medical outcomes, these Defendants failed and refused to correct the identified deficiencies, choosing to maintain their grossly inadequate and unconstitutional policies, procedures, customs regarding treatment of detainees, conditions of confinement and health care delivery system. This broken system failed Janway and was the moving force behind his injuries and damages alleged herein.

## THE PARTIES

Plaintiff re-alleges and incorporates the foregoing paragraphs, as though full set forth herein.

8.      Plaintiff, Geneva Janway, is and was a citizen and resident of LeFlore County.

9.      Aaron Janway was a citizen and resident of LeFlore County, Oklahoma, at the time of the incident(s) hereinafter described.

10.     Defendant County is the legislative entity with non-delegable statutory responsibility for providing a jail facility for Leflore County Detention Center ("LCDC") that is adequate for the safe keeping of inmates and detainees. *See* 57 O.S. § 41. County is charged with ensuring the LCDC has adequate funding, facilities, and resources to provide constitutionally sufficient conditions of confinement.

11.     Defendant County is and was at all times relevant hereto responsible for the training and supervision of Defendants Derryberry, Melson, Deihl, Case, Tomlin, Lnu, Hasting and Stigler, Health, Lyons, and Lauglin.

12.     Defendant County at all times relevant hereto, delegated to Derryberry and/or Melson the responsibility and authority to establish and implement policies, procedures, practices, and customs used at the LeFlore County Detention Center ("LCDC") regarding (1) the use of force against pre-trial detainees, (2) the provision of medical care to pre-trial detainees, and (3) the conditions of confinement of pre-trial detainees.

13.     At all times relevant hereto, Defendant County and its officers Derryberry, Melson, Deihl, Case, Tomlin, Lnu, Hasting, and medical staff, Lyons, and Lauglin. were acting under color of law.

14.     In the alternative, Defendant Trust is and was at all times relevant hereto responsible for the training and supervision of Defendants Defendants Derryberry, Melson, Deihl, Case, Tomlin, Lnu, Hasting and Stigler, Health, Lyons, and Lauglin.

15.     Defendant Trust at all times relevant hereto, delegated to Derryberry and/or Melson the responsibility and authority to establish and implement policies, procedures, practices, and customs used at the LeFlore County Detention Center ("LCDC") regarding (1) the use of force against pre-trial detainees, (2) the provision of medical care to pre-trial detainees, and (3) the conditions of confinement of pre-trial detainees.

16.     At all times relevant hereto, Defendant Trust and its officers Derryberry, Melson, Deihl, Case, Tomlin, Lnu, Hasting, and medical staff, Lyons, and Lauglin were acting under color of state law.

17.     County was responsible for the supervision of Defendant Stigler and/or Health in its role as County's contractor for provision of medical care at the detention center.

18.     In the alternative, Trust was responsible for the supervision of Defendant Stigler and/or Health in its role as County's contractor for provision of medical care at the detention center.

19.     The policies, practices and customs, promulgated, created, implemented and/or utilized by County represent the official policies and/or customs of County with regards to operation of the LCDC.

20.     In the alternative, the policies, practices and customs, promulgated, created, implemented and/or utilized by Trust represent the official policies and/or customs of County with regards to operation of the LCDC.

21.     Defendant Derryberry was, at all times relevant hereto, LeFlore County Sheriff employed by and working for the Board of County Commissioners for County. Derryberry engaged in conduct complained of under color of law and within the scope of his employment as agent and representative of County. County delegates final decision-making and/or policy-making authority to Derryberry for establishing policy with regards to the operation of the LCDC, including the detention and medical care of mentally and physically ill, cognitively and physically disabled, and otherwise vulnerable detainees. The policies, practices, and customs promulgated, created, implemented, and/or utilized by Derryberry represent the official policies and/or customs of County with regard to operation of the LeFlore County Jail.

22.     Melson was, at all times relevant to this action, the Jail Administrator for the LCDC, and is responsible for the operation of the LCDC, including the supervision of Stigler and/or Health. Melson is sued in both his individual capacity and in his official capacity for acts performed while he was the Jail Administrator of LeFlore County. At all times relevant herein, Melson was acting under the color

of law and within the course and scope of his employment with the Board of County Commissioners of Leflore County and/or Leflore County Detention Center Public Trust.

23.    Deihl, Case, Tomlin, Lnu, Melson and Hasting were, at all times relevant hereto, jailers at LCDC, employed by and working for County, Trust, and/or Derryberry. Deihl, Case, Tomlin, Lnu, Melson and Hasting engaged in the conduct complained of under color of law and within the scope of his/her employment as agent and representative of County, Trust, and/or Derryberry.

24.    Defendant Stigler is a private domestic company or other legal entity that is independently contracted by County and/or Trust to provide medical services at LCDC.

25.    Defendant Stigler engaged in the conduct complained of under color of law and within the scope of its contract/employment with County and/or Trust.

26.    In the alternative to the preceding paragraph, Defendant Stigler acted in such a manner, or with such a mindset to equate to deliberate indifference, bad faith, malice, and/or reckless disregard of the rights, health, and safety of Janway, such that it was acting outside the scope of its employment.

27.    Defendant Health is a private domestic company or other legal entity that is independently contracted by County and/or Trust to provide medical services at LCDC.

28.    Defendant Health engaged in the conduct complained of under color of law and within the scope of its contract/employment with County and/or Trust.

29.    In the alternative to the preceding paragraph, Defendant Health acted in such a manner, or with such a mindset to equate to deliberate indifference, bad faith, malice, and/or reckless disregard of the rights, health, and safety of Janway, such that it was acting outside the scope of its employment.

30.    Stigler, Health, Lyons and Laughlin were contracted/hired to provide medical services and care for detainees at LCDC.

31.    Defendant Stigler was at all times relevant hereto responsible for the training and supervision of Defendants Lyons and Lauglin.

32.     Defendant Health was at all times relevant hereto responsible for the training and supervision of Defendants Lyons and Lauglin.

33.     Lyons and Laughlin were, at all times relevant hereto, a medical professional at LCDC, employed by and working for Stigler and/or Health, but under the supervision and direction of County, Trust, Derryberry, and/or Melton. Lyons and Laughlin engaged in the conduct complained of under color of law and within the scope of his/her employment with Stigler and/or Health, and/or as agent and representative of County, Trust, Derryberry, and/or Melton.

## JURISDICTION AND VENUE

Plaintiff re-alleges and incorporates the foregoing paragraphs, as though full set forth herein.

34.     This action arises from events that occurred during the detention of Janway at the LCDC which ultimately resulted in his death.

35.     Defendants' conduct, events and transactions relevant to this lawsuit occurred in Leflore County, Oklahoma.

36.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth Amendment and Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

37.     The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

38.     This Court has supplemental jurisdiction over any state law claims to be asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

39.     Venue: is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

Plaintiff re-alleges and incorporates the foregoing paragraphs, as though full set forth herein.

40.     Janway was taken to the LCDC on October 3, 2021, to be held as a pretrial detainee..

41.     At the time of his arrival at the LCDC, Janway had not been convicted of any crime.

42.     Upon Janway's arrival at the LCDC, neither Stigler, Health nor any employee at LCDC, performed a medical evaluation of Janway.

43.     Moreover, nothing else was done as far as a medical intake on Janway, including not even taking his vital signs.

44.     Pursuant to the Oklahoma Jail Standards, OAC 310:670-5-8(2), intake screenings shall be performed on all inmates immediately upon admission to the facility and before being placed in the general population or housing area. An inmate whose screening indicates a significant medical or psychiatric problem shall be observed frequently by the staff consistent with the facility's policy and the identified need until the appropriate medical evaluation has been completed.

45.     National jail standards require an evaluation of inmates at intake to the facility to determine whether they are medically capable of being detained at the jail or were in need of medical attention beyond the ability of the facility to provide.

46.     Based on OAC 310:670-5-8(2), Janway was required to be under frequent observation the during some of the time he was present in the LCDC.

47.     Despite this requirement, the Jailer Defendants did not "frequently observe" Janway during his detention through either sight checks or monitoring the 24-hour video surveillance in his cell; the Jailer Defendants specifically did not check on Janway during the final few days of his detention, except to berate Janway and physically and verbally abuse and batter Janway.

48.    Even without the special status requiring "frequent observation" Janway was to still be checked on with at least an hourly sight check, as well as a sight check as a part of the inmate count at the beginning of each detention officer shift.

49.    Defendant Stigler/Health were aware that Janway had hypertension and prescribed him Lisinopril.

50.    Jailer, Tabetha Prock ("Prock") observed Janway in the jail on or around November 23, 2021. Prock observed that Janway was unable to eat and was repeatedly vomiting. Based on Prock's observations, it was obvious that Janway needed immediate medical attention.

51.    Prock immediately notified a senior jailer, Defendant Deihl, about her concerns, and stated to Deihl that Janway needed medical treatment.

52.    During this time period, Defendants Deihl, Hasting and Melson were also made aware that Janway was vomiting because they had to remove Janway and his cell mate from their cell to clean up Janway's vomit.

53.    In reckless disregard to Janway's obvious signs of distress which required immediate medical attention, Deihl told Prock that Janway was "faking" his condition and refused to provide Janway with appropriate medical screening, evaluation or treatment.

54.    Janway's condition deteriorated from November 23, 2021 to December 15, 2021. During this time, Janway was not eating, was unable to walk or get off the floor on his on power. Janway was repeatedly vomiting and was defecating himself. Janway's mental status had clearly changed. He was lethargic and unalert.

55.    Around the same time, awareness among jailers and supervisors of Janway's condition increased. Defendants Deihl, Hasting, Tomlin, Lnu and Melson had knowledge concerning Janway's hypertension and various mental health conditions, and that he was taking medications such as Lisinopril, Keppra, and Klonopin.

56.     Defendant Case became aware that Janway was not eating when he discovered and removed multiple plates of uneaten food from Janway's cell. Defendant Case was also aware that Janway's health was rapidly deteriorating and that Janway was vomiting, unable to walk or get off the floor. Despite his awareness that Janway was not eating and that Janway's health necessitated immediate medical attention, Defendant Case did nothing to get medical attention for Janway.

57.     Sometime in December, Defendant Tomlin observed Janway literally fall out of his cell door. At that point, Janway had defecated himself and was too physically weak to stand or get off the floor. He had not eaten in weeks, was dehydrated, and had been repeatedly vomiting. Despite his awareness that Janway was not eating and that Janway's health necessitated immediate medical attention, Tomlin did nothing to get medical attention for Janway.

58.     Instead an apparent attempt to punish Janway for Defendants' belief that Janway was faking his condition, Deihl and Tomlin withheld food, water and prescription medications from Janway for extended periods of time.

59.     When Janway could not stand, Tomlin and Deihl dragged Janway on the jail floor in a manner that was unnecessary, unreasonable and cruel, and designed to punished and humiliate Janway.

60.     By December 15, 2021, Janway's condition had deteriorated to the point he was nearly unconscious. Janway was unable to stand, to walk, or to communicate. He had feces smeared to his buttock and clothes after losing fecal continence.

61.     When Deihl refused to get medical treatment for Janway, Prock, recognizing the obvious signs that Janway needed immediate medical treatment told Deihl's superior, Defendant Hasting, of her concerns – specifically Prock stated to Hasting:

> **Prock** – "Can I be upfront with concerns I have?"
> **Hasting** – "Yes."
> **Prock** – Janway. That big dude with curly hair been here a couple months…he hasn't eatin in a very long time. Like. He wasn't eating before thanksgiving and still ain't. Well, I have been concerned about him. He is special needs. He has been layed out in the floor shitting on himself because he is so weak to get up. They got him in a wheelchair and took him to the shower. He is

layed out in the floor, in the shoer, clothes on. Just laying there! This boy needs medical help. And Laura [Deihl] claims 'it's a shower' when I say anything!'"

**Hasting** – "She is absolutely right he is doing it to get a medical or"

**Prock** – "I don't want Laura [Deihl] to know I said anything to you about it. Because I already addressed my concerns to her. Regardless of why he is doing it. He needs fluids.

**Hasting** – "He is literally doing it to himself. We offer him fluids and we can't force him to drink"

**Prock** – "He is mentally challenged."

**Hasting** – "You are right he is"

**Prock** – "I would just hate to see something happen to him"

**Hasting** – "And I would too but there's nothing we can do"

**Prock** – "Okay. Ya'll are the bosses…"

62.     After this conversation and in an apparent attempt to punish Janway for "faking" his condition which obviously showed that his condition had deteriorated significantly, Defendants Tomlin and Deihl put Janway in an extremely cold shower and left him there for more than twenty minutes in order to "wake him up."

63.     Sometime later that same day, an ambulance was called because Janway was found unconscious after being left in a freezing cold shower for more than twenty minutes.

64.     While in the freezing cold shower, Janway suffered a heart attack, cardiac arrest, and possible seizures.

65.     When the ambulance took Janway's body temperature, it measured 93.2 degrees. Hypothermia sets in at body temperatures under 95 degrees. Janway's skin was described by EMS as "cold", "cyanotic" and "pale." His blood pressure got as allow as 61 over 29 and his pulse was as high as 161 beats per minute. EMS described Janway as being in "shock".

66.     While in the shower, Janway was in obvious distress. He was barely conscious. He could not get off the floor.

67.     While in the shower, Tomlin and other detention officers slammed Janway's head into the tile shower wall in a manner that was unnecessary, unreasonable and cruel, and designed to punished and humiliate Janway.

68.     Defendants were aware of Plaintiffs medical and mental health needs well in advance of the

time frame within which Plaintiff suffered seizures, became unconscious in the shower floor, or required life-saving measures.

69.     Despite the requirements and obvious need for frequent observation of Janway, no medical professional ever attempted to perform a medical evaluation of Janway during the time period from November 23, 2021 to December 15, 2021, despite the fact that Deihl, Hasting, Derryberry, and Melson were actually aware of Janway's serious health condition and declining health.

70.     Due to the severity of Janway's condition – and the fact that it had been an ongoing episode since at least November 23, 2021 – Janway should have been sent to a hospital, referred to see a medical doctor or transferred to another facility where Janway could be seen by a psychiatrist, physician, or other licensed medical provider as defined in 57 O.S. § 4.1(3).

71.     During at least the final few days of his incarceration, the Jailer Defendants, each assigned to perform sight checks on Janway's cell for at least one shift during that period, did not perform any sight checks on Janway, which were required to be performed at a minimum every hour, and thus Janway's pleas for medical assistance went unanswered by the Jailer Defendants or any other Defendant as a result.

72.     In the alternative to the preceding paragraph, while Janway was crying and begging for help, the Jailer Defendants each individually performed sight checks in that area for at least one shift during the period and completely ignored Janway's obvious obvious symptoms and medical needs, suffering and pleas for help, and never sent any medical personnel to check on him or perform a medical evaluation. The Jailer Defendants each either wholly ignored Janway's pleas for help or simply assumed he was faking with no justification for such belief.[1]

---

[1] Without discovery or access to jail staffing and medical staffing rosters and records, Plaintiff is unable to provide the specific date and time of each shift the Jailer Defendants were assigned to such post/role during Janway's detention and is unable to provide the specific date and time of each shift each of the defendants were assigned to monitor and/or provide care for Janway. Plaintiff makes these allegations to the best of her knowledge without such documents, information, and knowledge which is solely in the possession of Defendants County, Trust, Sheriff, Administrator, the Jailer Defendants, Stigler, and/or Health.

73.     In the alternative to the two preceding paragraphs, the Jailer Defendants each individually observed Janway's obvious severe mental and cognitive health decline and need for treatment, his deteriorating medical condition, and heard his cries and pleas for help, during at least one shift during Janway's detention from and reported such pleas and obvious need for treatment to each of Defendants Stigler and/or Health during that timeframe. Following that notice, each of Defendants Stigler, Health, Lyons, and/or Laughlin chose not to perform any follow-up to check on Janway, to evaluate his condition, to provide him any treatment, provide him access or referral to an appropriate medical provider capable of assessing/treating his condition, and/or failed to refer him to another facility actually capable of handling Janway's psychiatric and/or medical needs. [2]

74.     In the alternative to the three preceding paragraphs, the Jailer Defendants each individually observed Janway's obvious severe mental and cognitive health decline and need for treatment, his deteriorating medical condition, and heard his cries and pleas for help, during at least one shift during Janway's detention and reported such pleas and obvious need for treatment to each of Defendants Stigler/Health Medical Staff during that timeframe. Following that notice, each of Defendants Stigler, Health, Lyons, and/or Laughlin individually checked on Janway and were aware of and documented his condition, that he needed to be sent to a hospital, seen by a medical doctor, that he needed a higher-level medical provider to examine and assess his ongoing and worsening complaints and physical deterioration, and/or documented that Janway needed to be transferred to another facility actually capable of handling Janway's mental, cognitive and/or medical needs, but chose not to take any action to provide such care, treatment, access, or transfer.

75.     In the alternative to the four preceding paragraphs, the Jailer Defendants each individually observed Janway's obvious severe mental and cognitive health decline and need for treatment, his deteriorating medical condition, and heard his cries and pleas for help, during at least one shift during

---

[2] Plaintiff incorporates footnote 1 herein.

Janway's detention and reported such pleas and obvious need for treatment to each of Defendants Stigler/Health and/or Lyons and Lauglin during that timeframe. Following that notice, each of Defendants Stigler/Health Medical Staff individually checked on Janway and were aware of and documented his condition, that he needed to be sent to a hospital, seen by a medical doctor, that he needed a higher-level medical provider to examine and assess his ongoing and worsening complaints and physical deterioration, and/or documented that Janway needed to be transferred to another facility actually capable of handling Janway's mental, cognitive and/or medical needs, but Janway never received such treatment from any appropriately qualified medical provider as Defendants Stigler, Health, Lyons and/or Lauglin deliberately ignored such documentation and needs.[3]

76.    During some or all of Janway's detention at LCDC, Janway's cell was under 24-hour video surveillance which is supposed to be monitored by jail staff at all times.

77.    During Janway's detention, the Jailer Defendants were each individually assigned to monitor the video surveillance cameras, including video of Janway in his cell, for at least one shift each during that timeframe. Even though Janway could be seen struggling to walk, not eating, vomiting and having seizures, as well as crying for days and each of the Jailer Defendants individually saw Janway's actions and understood that he was in obvious need of mental and/or medical attention, each of the Jailer Defendants failed to send anyone to check on Janway or notify medical staff that he appeared to be in distress while watching the video surveillance cameras. [4]

78.    In the alternative to the preceding paragraph, the Jailer Defendants each failed to actually attend to or monitor the surveillance cameras during their shift(s) assigned to that post during Janway's detention, leaving Janway's pleas for emergency medical assistance to go unanswered and his obvious deteriorating medical condition to go ignored.[5] Instead, each of the Jailer Defendants individually chose

---

[3] Plaintiff incorporates footnote 1 herein.
[4] Plaintiff incorporates footnote 1 herein.
[5] Plaintiff incorporates footnote 1 herein.

to ignore their assigned responsibilities and monitoring of the surveillance cameras and ignored the known risk that an inmate in need of serious medical and/or psychiatric care would have their obvious, observable need for emergency care go without response resulting delays or denials of treatment and serious risk of harm and/or death of such inmates.

79.    In the alternative to the two preceding paragraphs, each of the Jailer Defendants individually saw Janway's condition and actions, understood that he was in obvious need of serious psychiatric and/or medical attention, and subsequently notified other detention officers of Janway's distress, but those detention officers either chose not to check on Janway even once or, due to mismanagement and/or understaffing of the LCDC, those officers were unable to check on Janway due to being called to fulfill other job positions, leaving no one to monitor for or respond to inmates in need of emergency psychiatric and/or medical care.[6]

80.    In the alternative to the three preceding paragraphs, each of the Jailer Defendants individually saw Janway's actions and condition and understood that he was in obvious need of serious medical and/or psychiatric attention. Each of the Jailer Defendants individually notified Defendants Stigler/Health Medical Staff, including Defendants Lyons and/or Laughlin of Janway's distress and apparent need for medical and psychiatric care, but Defendants Stigler/Health Medical Staff, Lyon's, and Laughlin each individually chose not to respond or check on Janway,  chose not to conduct a medical evaluation with full knowledge that Janway showed a significant and obvious decline in health since he last saw a medical professional, chose not to provide any proper medical treatment to Janway, failed to refer him to an appropriate level of medical professional, and failed to refer Janway to an outside facility actually capable of providing needed medical and/or psychiatric treatment to Janway, all with full knowledge that non-medically-trained detention officers recognized and reported a serious medical need – evidenced by Janway's days of repeated pleas for medical assistance and clear deteriorating physical

---

[6] Plaintiff incorporates footnote 1 herein.

condition – and that Janway had a serious need for psychiatric treatment.[7]

81.     In the alternative to the preceding four paragraphs, each of the Jailer Defendants individually saw Janway's actions and understood that he was in obvious need of medical and psychiatric attention and notified each of Defendants Stigler/Health Medical Staff, including Lyons and Laughlin and in turn, each of Defendants Stigler/Health Medical Staff individually checked on Janway and were aware of and documented his condition, that he needed to be sent to a hospital, seen by a medical doctor, that he needed a higher-level medical provider to examine and assess his ongoing and worsening complaints and physical deterioration, and/or documented that Janway needed to be transferred to another facility actually capable of handling Janway's psychiatric and medical needs, but Janway never received such treatment from any appropriately qualified medical provider as Defendants Stigler, Health, Lyons and Laughlin deliberately ignored such documentation and needs.[8]

82.     In deliberate indifference to Janway's serious medical and mental health needs, Defendants, and the medical staff under their supervision and control as described herein, failed to provide adequate or timely evaluation and treatment, even though Janway's known medical condition deteriorated and he had specifically requested medication and medical treatment while in Defendants' custody.

83.     The failures to provide prompt and adequate care in the face of known and substantial risks to Janway's health and well-being include, inter alia: failure to conduct appropriate medical and mental health assessments; failure to create and implement appropriate medical and mental health treatment plans; failure to promptly evaluate Janway's physical and mental health; failure to properly monitor Janway's physical and mental health; failure to provide medically necessary medications; failure to provide medically necessary medications in the correct dosage; failure to provide access to medical personnel capable of evaluating and treating his serious health needs; and failure to take precautions to protect Janway from

---

[7] Plaintiff incorporates footnote 1 herein.
[8] Plaintiff incorporates footnote 1 herein.

further injury.

84.    Derryberry and/or Melson specifically failed to supervise the medical staff under their supervision and failed to assure that medical staff was providing appropriate care to Janway in deliberate indifference to his known and serious medical needs.

85.    Stigler and/or Health specifically failed to supervise the medical staff under their clinical supervision and failed to assure that medical staff was providing appropriate care to Janway in deliberate indifference to his known and serious medical needs.

86.    Defendants' deliberate indifference to Janway's serious medical needs was in furtherance of and consistent with: (a) policies, customs and/or practices which Sheriff Derryberry promulgated, created, implemented or possessed responsibility for the continued operation of; and (b) policies, customs and/or practices which Stigler/Health had responsibility for implementing and which Stigler/Health assisted in developing.

87.    There are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the LCDC. Sheriff Derryberry, Administrator Melson and Stigler/Health have long known of these systemic deficiencies and the substantial risks to inmates like Janway, but have failed to take reasonable steps to alleviate those deficiencies and risks.

88.    After Janway was transported to the hospital, Defendants Derryberry, Melson, Case, Deihl, Lnu and Tomlin actively and intentionally altered Janway's medical and intake records in order to hide the fact they disregarded Janway's obvious medical needs.

## CAUSES OF ACTION

## COUNT I

## FOURTEENTH AMENDMENT VIOLATION – EXCESSIVE FORCE AND/OR CRUEL AND UNUSUAL PUNISHMENT

Plaintiff re-alleges and incorporates the foregoing paragraphs, as though full set forth herein.

89.     Under the Fourth Amendment of the United States, every person in the United States of America has the right to be secure against unreasonable seizures of their person, and 42 U.S.C. § 1983 prevents individuals from acting in a government capacity or under color of law from unlawful deprivation of those rights.

90.     Under the Eighth Amendment, every person in the United States of America, including pretrial detainees, has the right to be secure against cruel and unusual punishment, and 42 U.S.C. § 1983 prevents individuals from acting in a government capacity or under color of law from unlawful deprivation of those rights.

91.     Defendants Tomlin's conduct, specifically, slamming the head of an obviously physically ill, and/or mentally ill person into a tile shower wall, where the individual was not dangerous and posed no threat of physical harm to Defendants Tomlin, or others, constitutes excessive force, cruel and unusual punishment and is a deprivation of Janway's rights secured under the U.S. Constitution.

92.     Defendants Tomlin and Deihl's conduct, specifically, dragging an obviously physically ill, and/or mentally ill person by his feet across a jail floor, where the individual was not dangerous and posed no threat of physical harm to Defendants Tomlin or Diehl, or others, constitutes excessive force, cruel and unusual punishment and is a deprivation of Janway's rights secured under the U.S. Constitution.

93.     Defendants Tomlin, Lnu, Case's conduct, specifically, placing a physically ill, and/or mentally ill person in a freezing cold shower and leaving him for more than twenty (20) minutes, constitutes excessive force, cruel and unusual punishment and is a deprivation of Janway's rights secured under the U.S. Constitution.

94.     A reasonable law enforcement officer would know that the use of excessive force under these circumstances is a violation of constitutionally guaranteed rights and that a citizen's rights not to be subjected to such excessive force was clearly secured and established at the time. See *Graham v. Connor,* 490 U.S. 386, 397 (1989); *Buck v. City of Albuquerque,* 549 F.3d 1269, 1290 (10th Cir. 2008).

95.     At the time of the actions and/or omissions of Defendants Tomlin and Deihl, 22 O.S. § 34.1 defined "excessive force" as "force which exceeds the degree of physical force permitted by law or the policies and guidelines of the law enforcement entity."

96.     It is not reasonable to slam an individual's head against a wall when that individual does not pose an immediate threat to an officer or others.

97.     It is not reasonable to drag an individual across the ground by his feet when that individual does not pose an immediate threat to an officer or others.

98.     It is not reasonable to put an individual, especially one who is dire physical condition, unable to walk, unable to get off the floor, and has been vomiting and lost bowel control, in a freezing cold shower and leave him until his internal body temperature is less than 92 degrees.

99.     Defendants Tomlin, Lnu, Case and Deihl had a duty to refrain from violating Janway's constitutional rights.

100.    Any reasonable law enforcement officer would have been aware that the conduct of Defendants Tomlin, Lnu, Case and Deihl, as described herein, would violate Janway's constitutional rights.

101.    The force that Defendants Tomlin and Deihl used was excessive and unnecessary under the totality of the circumstances.

102.    The excessive force used by Defendants Tomlin and Deihl upon Janway was not justified or privileged under clearly established law.

103.    No legitimate law enforcement or penal objective was accomplished by the degree of such force utilized by Defendants Tomlin and Deihl.

104.    Defendants Tomlin and Deihl's use of force was objectively unreasonable, as well as intentional, willful, wanton, and in gross and reckless and negligent disregard of Janway's rights under the Fourth and/or Eighth Amendments of the United States Constitution.

105.    The use of force by Defendants Tomlin and Deihl against Janway posed a substantial risk of causing serious bodily harm that was known to Defendants Tomlin and Deihl at the time and did in fact cause great bodily harm, mental and emotional injury, and dignitary injury.

106.    Janway was aware that he was dying and needed immediate medical attention, while Defendant Tomlin slammed his head against a tile shower wall. Defendants Tomlin's actions were indecent, inhumane, traumatic, and completely unacceptable in a civilized society.

107.    Tomlin was aware that Janway needed immediate medical attention, while Defendant Tomlin slammed his head against a tile shower wall. Defendants Tomlin's actions were indecent, inhumane, traumatic, and completely unacceptable in a civilized society.

108.    Janway was aware that he was dying and needed immediate medical attention, while Defendants Tomlin and Deihl dragged him across the floor by his feet. Defendants Tomlin and Deihl's actions were indecent, inhumane, traumatic, and completely unacceptable in a civilized society.

109.    Tomlin and Deihl were aware that Janway needed immediate medical attention, while Defendants Tomlin and Deihl dragged him across the floor by his feet. Defendants Tomlin and Deihl's actions were indecent, inhumane, traumatic, and completely unacceptable in a civilized society.

110.    Janway was aware that he was dying and needed immediate medical attention, while Defendants Tomlin, Lnu, Case and Deihl dragged him into a freezing cold shower and left him there until he was in a hypothermic state. Defendants Tomlin, Lnu, Case and Deihl's actions were indecent, inhumane, traumatic, and completely unacceptable in a civilized society.

111.    Tomlin, Lnu, Case and Deihl were aware that Janway needed immediate medical attention, while Defendants Tomlin, Lnu, Case and Deihl dragged him into a freezing cold shower and left him there until he was in a hypothermic state. Defendants Tomlin, Lnu, Case and Deihl's actions were indecent, inhumane, traumatic, and completely unacceptable in a civilized society.

112.    The above-described conduct of Defendants Tomlin, Lnu, Case and Deihl was a direct and proximate cause of the deprivation of Janway's clearly established Fourth and/or Eighth Amendment rights, as well as the resulting injuries, and damages described below.

113.    Defendants Tomlin, Lnu, Case and Deihl, under color of law, unjustifiably used excessive force and inflicted cruel and unusual punishment on Janway, and thus, violated Janway's constitutional rights and is therefore, "liable...in an action at law, suit in equity, or other proper proceeding for redress..." as per 42. U.S.C. § 1983.

## COUNT II

## FAILURE TO INTERVENE TO PREVENT EXCESSIVE FORCE AND CRUEL AND UNUSUAL PUNISHMENT

Plaintiff re-alleges and incorporates the foregoing paragraphs, as though full set forth herein.

114.    At the time of the actions alleged in paragraphs above regarding use of excessive, other jailers, including Deihl, Case, Lnu, and Hasting were present at the time of Tomlin's multiple uses of excessive force.

115.    At the time of the actions alleged in paragraphs above, other jailers, including Case, Lnu, and Hasting were present at the time of Tomlin, Case, Lnu and Deihl's multiple uses of excessive force and cruel and unusual punishments.

116.    Additionally, Derryberry, Melson, Deihl, Case, Lnu, and Hasting were also aware of Janway's deteriorated medical condition, including not eating for several days, vomiting, defecating uncontrollably, suffering seizures and being unable to stand or walk.

117.    Derryberry, Melson, Deihl, Case, Lnu, and Hasting were aware of the excessive force being used by Tomlin when Tomlin slammed Janway's head into a shower wall.

118.    Derryberry, Melson, Case, Lnu, and Hasting were aware of the excessive force being used by Deihl and Tomlin when Deihl and Tomlin dragged Janyway by his feet across the jail floor.

119.    Derryberry, Melson, Deihl, Case, Lnu, and Hasting were aware that Janway made no movements and presented no threat warranting the uses of force on Janway.

120.    Derryberry, Melson, Deihl, Case, Lnu, and Hasting were also aware of the excessiveness of slamming Janway's head against the shower wall, and that use of such force under the totality of the circumstances was unreasonable and cruel.

121.    Derryberry, Melson, Case, Lnu, and Hasting were also aware of the excessiveness of dragging Janway by his feet when he was unable to walk or stand, was vomiting and mentally ill, and that use of such force under the totality of the circumstances was unreasonable and cruel.

122.    Despite their knowledge of Janway's condition and the absence of any movements or threat presented by Janway, and despite their knowledge that use of force against Janway by Tomlin, on at least one occasion and Tomlin and Deihl, on at least one other occasion, was unwarranted, unreasonable, and excessive, the remaining Defendants, Derryberry, Melson, Deihl, Case, Lnu, and Hasting did nothing to intervene and stop the abuse of Janway by Tomlin, or by Tomlin and Deihl.

123.    As a result of the failures of Derryberry, Melson, Deihl, Case, Lnu, and Hasting faillure to intervene to stop or prevent the uses of excessive force against Janway, Janway sustained injuries, including unnecessary pain and suffering while already in a dire medical condition.

## COUNT III

## DELIBERATELY INDIFFERENT POLICIES, PRACTICES AND CUSTOMS, AND DELIBERATELY INDIFFERENT TRAINING AND SUPERVISION – EXCESSIVE FORCE AND CRUEL AND UNUSUAL PUNISHMENT

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

124.    Defendants Derryberry and Melson were aware that pursuant to 22 O.S. § 34.1 "[e]ach law enforcement entity which employs any peace officer shall adopt policies and guidelines concerning the

use of force by peace officers which shall be complied with by peace officers in carrying out the duties of such officers within the jurisdiction of the law enforcement entity."

125.     The above-described conduct regarding Deihl and Tomlin's excessive use of force, and Tomlin, Case, Lnu, and Deihl's cruel and unusual showering of Janway reflects an established policy, practice, custom, or decision, officially adopted or informally accepted, ratified, or condoned by Defendants Derryberry and Melson, and their officials and employees, that consists of permitting and encouraging detention officers detaining individuals with serious, life-threatening physical illness and/or mental health crisis without proper training and supervision as to how encounter and communicate with those citizens and avoid unnecessary and unreasonable use of force.

126.     During all times relevant hereto, there were no guidelines, or wholly inadequate guidelines, in place as to the standard of care specific to detainee's physical and mental health. It is common knowledge that physical illness, and/or mental illness is prevalent in citizens who encounter police and it is vital that jails have policies in place establishing a constitutionally permissible standard of care for officers to follow in order to address this crisis.

127.     It is clearly established law that Defendants Derryberry and Melson must train and supervise police officers, deputies, and other jail personnel about proper procedures for detaining individuals like Janway and the reasonable use of force, including, but not limited to, excessive force, to reduce the pervasive and unreasonable and substantially certain risk of grave constitutional injury.

128.     Defendants Derryberry and Melson have an affirmative duty to take action to properly train and supervise its employees or agents and prevent their unlawful actions.

129.     Defendants Derryberry and Melson failed to properly train and supervise its employees or agents in a manner and to an extent that amounts to deliberate indifference. Defendants Deihl, Lnu, Case and Tomlin engaged in the above-described conduct pursuant to or because of this policy, practice, custom, or decision.

130.    Defendant Derryberry was the official policymaker and final decision-maker for and at the LCDC.

131.    Under information and belief, Defendant Derryberry had a policy, custom, and procedure of not ensuring that detention officers like Defendants Deihl, Lnu, Case, and Tomlin were appropriately and adequately trained or supervised as to when and under what circumstances to use force.

132.    Under information and belief, Defendant Derryberry had a policy, custom, and procedure of not ensuring that officers like Defendants Deihl, Lnu, Case and Tomlin were appropriately and adequately trained or supervised as to when and under what circumstances to obtain medical care for citizens who Defendants would foreseeably encounter.

133.    Upon information and belief, Defendant Derryberry, acting through its subordinate detention officers, including Melson, Hasting and Deihl, had a persistent, widespread practice of depriving citizens of their constitutional rights, that it was sufficiently common and well established as to constitute municipal policy or custom.

134.    Upon information and belief, these customs or policies of unconstitutional conduct, as shown by the acts and omissions of other subordinate law enforcement officers, permitted or condoned actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of such conduct.

135.    Defendants Derryberry and Melson understood that detention officers, such as Defendants Deihl, Lnu, Case, and Tomlin:

a.    could and would exceed constitutional limitations on the use of force;

b.    that the use of force may arise under circumstances that constitute a usual and recurring situation with which officers such as Defendants Deihl, Case, Lnu, and Tomlin must manage;

c.  that providing inadequate training or failing to enforce existing policies under such circumstances demonstrates deliberate indifference on the part of the Defendants toward persons with whom Defendants Deihl, Case, Lnu, and Tomlin would come into contact;

d.  and that failing to provide such training or to enforce policies and procedures to ensure that Defendants Deihl, Case, Lnu and Tomlin followed such training would be a direct causal link between the constitutional deprivation to which citizens, such as Janway, would be exposed—in other words, when Defendants sent Deihl and Tomlin into the jail, it was obvious that failing to adequately train them or enforce policies and procedures would equate deliberate indifference to the rights of the detainees with whom they came into contact.

136.  The above-described policies and customs of Defendant Derryberry permitted or condoned the violation of Janway's rights, demonstrated deliberate indifference to the constitutional rights of the persons within the LCDC and were the cause of the injuries and damages suffered by Janway.

137.  Defendant Derryberry also knew that absent the adoption of specific and/or adequate policies, procedures, and tactics governing law enforcement encounters with detainees like Janway, and absent training of detention officers in such policies, procedures, and tactics, it was highly predictable that such failure to train would lead to detention officers' violation of the Fourth and/or Eighth Amendment rights of detainees and inmates, and could likely result in the otherwise avoidable injury of such citizens.

138.  Inadequate training and supervision of Defendants Deihl, Lnu, Case and Tomlin about the proper procedures to be used in moving or showering a detainee, the use of force, including, but not limited to, excessive force, was so likely to result in grave constitutional injury to citizens that the failure to provide adequate training and supervision to Defendants Deihl, Lnu, Case, and Tomlin in these areas constituted a deliberate indifference to and acquiescence in such injury to Janway.

139.  Defendants Deihl, Lnu, Case, and Tomlin received no form of discipline or reprimand from Defendant Derryberry or Melson for their above-described use of excessive force against Janway.

140.     Defendant Derryberry ratified the conduct of Defendant Deihl, Lnu, Case, and Tomlin in concluding that the conduct was consistent with the policies, procedures, and training of Derryberry, Melson, LCDC, County and/or Trust.

141.     Defendants Deihl, Lnu, Case, and Tomlin's actions and/or inactions stem from the execution of a government policy, custom, or official decision of indifference as to the protection of citizens' constitutional rights and his actions can fairly be said to represent such a policy and custom.

142.     Defendant Derryberry and Melson's failure to ensure and accomplish or enforce such proper training caused Defendants Deihl, Lnu, Case, and Tomlin to use excessive force in violation of the U.S. Constitution, proximately and directly causing serious injury to Janway.

## COUNT IV

## DELIBERATE DISREGARD OF SERIOUS MEDICAL NEEDS IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS IN VIOLATION OF 42 U.S.C. § 1983

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

143.     Under the Eighth Amendment of the United States Constitution, inmates held in American prisons have a fundamental right to prison conditions that do not constitute "cruel and unusual punishment."

144.     An arrestee and pretrial detainee, such as Janway, who has not been convicted of a crime is at least "entitled to the degree of protection against denial of medical attention which applies to convicted inmates" under the Eighth Amendment. *Martinez v. Begg*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985); *Howard v. Dickerson*, 34 F.3d 978, 981 (10th Cir. 1994)).

145.     The Tenth Circuit Court of Appeals applies the Eighth Amendment's "deliberate indifference" standard to determine whether a pretrial detainee has been deprived of medical attention to such a degree

that his or her constitutional rights are violated. See *Id.*

146.    In the weeks leading up to his release from LCDC on December 15, 2021, Janway was suffering serious and life-threatening medical conditions including loss of appetite, inability to stand or walk (requiring the use of a wheelchair), vomiting, seizures, and fecal incontinence.

147.    The total failure of the Jailer Defendants, including Deihl, Hasting, Case, Tomlin, Lnu Derryberry, and Melson, as well as Stigler/Health Medical Staff, including Lyons and Laughlin to provide Janway with medical and psychiatric care given the clear severity of his physical conditions, including inability to stand, walk, communicate, eat, his vomiting and fecal incontinence, his seizures and hypertension, and his ongoing complaints of worsening severe pain and malaise, and the overall deterioration of his physical condition during the last few weeks of detention violated Janway's fundamental rights guaranteed under the U.S. Constitution to be free from deprivation of medical care constituting cruel and unusual punishment.

148.    It was apparent to all Defendants who came into contact with Janway from during his detention that he was suffering from severe and obvious conditions which required immediate medical attention, such that he was unconscious and/or at risk of considerable harm, or suffering an extremely severe physical and/or mental health crisis.

149.    The severity of Janway's symptoms of physical illness, and/or mental health crisis at the time he was detained and up to the point he was found unresponsive were so great in magnitude that even a lay person would have recognized the fact that he required treatment by a medical professional.

150.    Further, the severity of Janway's declining condition in the last few days of his detention with persistent complaints of worsening severe pain, vomiting, fecal incontinences, inability to stand or walk, inability to eat, and his obviously deteriorating physical condition were so great in magnitude that even a lay person would have recognized the fact that he required treatment. This is highlighted by the fact that one non-medically-trained detention officer did in fact recognize that Janway required medical attention

in the weeks leading up to his passing out unconscious.

151.    Such conditions – and the potentially life-threatening harm presented by those symptoms – were so obvious that even a lay person would easily recognize the need for immediate medical attention from a doctor and/or hospitalization.

152.    In fact, the condition and symptoms were so obvious – and so obviously harmful – that one detention center employee specifically brought up Janway's condition to Deihl and Hasting telling them that Janway's medical condition had significantly declined and that it was apparent and obvious to her that Janway needed immedaite medical treatment.

153.    When Hasting and Deihl refused to do anything for Janway in response to the detention officer's concerns, that same detention officer then raised concerns with other detention officers and supervisors regarding Janway's serious need for medical attention and Lyon and Laughlin's refusal to examine Janway, provide care, or take him to the hospital.

154.    Defendants Deihl, Case, Tomlin, Lnu, Hasting, Derryberry, Melson, Lyons and Laughlin, and other jail employees were all personally present during Janway's detention and failed to intervene to prevent or remedy Defendants' failure to provide a proper health evaluation, proper classification of Janway's severe physical illness and/or mental health crisis, and adequate or timely medical attention.

155.    Despite Defendants Deihl, Case, Tomlin, Lnu, Hasting, Derryberry, Melson, Lyons and Laughlin's knowledge and awareness as a law enforcement officers, jailers and/or medical professionals of typical signs, symptoms and duration of severe physical illness and/or mental health crisis associated with the conditions Janway suffered, Defendants denied repeated requests by Janway for medical attention, and otherwise disregarded obvious and substantial risk that Janway would suffer severe health decline or death if not provided with immediate medical attention.

156.    Defendants Deihl, Case, Tomlin, Lnu, Hasting, Derryberry, Melson, Lyons and Laughlin knew with substantial certainty that Janway was experiencing acute physical illness and/or mental health crisis

because of Janway's own statements or because of their personal observations and knowledge of the numerous symptoms that he exhibited.

157.    Defendants Deihl, Case, Tomlin Lnu, Hasting, Derryberry and Melson knew (either through actual or constructive knowledge) that Janway had serious medical and mental health needs.

158.    Defendants Deihl, Case, Tomlin Lnu, Hasting, Derryberry and Melson failed to provide an adequate physical and mental health evaluation on a number of occasions, and failed to provide timely or adequate treatment for Janway while he was placed at the LCDC.

159.    Defendants Deihl, Case, Tomlin Lnu, Hasting, Derryberry and Melson's acts and/or omissions of indifference as alleged herein, include but are not limited to their failure to treat Janway's serious medical and mental health condition properly; failure to conduct appropriate medical and mental health assessments; failure to create and implement appropriate medical and mental health treatment plans; failure to promptly evaluate Janway's physical and mental health; failure to properly monitor Janway's physical and mental health; failure to provide access to medical and mental health personnel capable of evaluating and treating his serious health needs; and a failure to take precautions to prevent Plaintiff from further injury.

160.    Defendants Deihl, Case, Tomlin Lnu, Hasting, Derryberry and Melson knew of (either through direct knowledge or constructive knowledge) and disregarded substantial risks to Janway's health and safety.

161.    Despite their awareness of Janway's heightened risk of injury, suffering, and death, Defendants Deihl, Case, Tomlin, Lnu, Hasting, Derryberry, Melson, Lyons and Laughlin chose to detain Janway without access to medical care and instead to further exacerbate Janway's condition through their cruel and unusual treatment of Janway, including withholding food and water, use of physical force, subjecting Janway to extremely cold water for extended periods of time while Janway was so physically incapacitated that he could not move.

162.    The aforementioned acts and/or omissions of Defendants Deihl, Case, Tomlin, Lnu, Hasting, Derryberry, Melson, Lyons and Laughlin, in light of their awareness and knowledge of Janway's condition and serious medical needs, display deliberate indifference to the substantial likelihood that depriving Janway of medical care would result in his injury and/or death.

163.    The aforementioned acts and/or omissions of Defendants Deihl, Case, Tomlin, Lnu, Hasting, Derryberry, Melson, Lyons and Laughlin, were a direct and proximate cause of Janway's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of life, and all other damages alleged herein.

164.    The aforementioned acts and/or omissions of Defendants Deihl, Case, Tomlin, Lnu, Hasting, Derryberry, Melson, Lyons and Laughlin, were the direct and proximate cause of damages suffered by Janway, including, but not limited to, pecuniary loss (including lost wages), grief, loss of companionship, pain, and suffering.

165.    The aforementioned acts and/or omissions of the individually named Defendants were malicious, reckless and/or accomplished with a conscious disregard of Janway's rights thereby entitling Plaintiff to an award of exemplary and punitive damages according to proof.

### COUNT V

### DELIBERATELY INDIFFERENT POLICIES, PRACTICES AND CUSTOMS, AND DELIBERATELY INDIFFERENT TRAINING AND SUPERVISION IN VIOLATION OF 42 U.S.C. § 1983 – MEDICAL DEPRIVATION

Plaintiff re-alleges and incorporates the foregoing paragraphs, as though full set forth herein.

166.    It is common knowledge that drug overdose, physical illness, and/or mental illness is prevalent in citizens who encounter jailers and it is vital that jails have policies in place establishing a constitutionally permissible standard of care for jailers and staff to follow in order to address this crisis.

167.    During all times relevant hereto, there were no guidelines, or wholly inadequate guidelines, in place as to the standard of care specific to detainees physical and mental health.

168.     The County and/or Trust delegates final authority to establish policy regarding detainee health and safety to Defendant Derryberry.

169.     Defendant Derryberry as decisionmaker with final authority to establish policy regarding detainee's health and safety, deprived Janway of rights and freedoms secured by the Fourteenth and Eighth Amendments of the U.S. Constitution—specifically freedom from deprivation of medical care constituting cruel and unusual punishment.

170.     In the alternative, Defendant County and/or Trust has the final authority to establish policy regarding detainee health and safety. Defendant County and/or Trust as decisionmaker with final authority to establish policy regarding detainee's health and safety, deprived Janway of rights and freedoms secured by the Fourteenth and Eighth Amendments of the U.S. Constitution—specifically freedom from deprivation of medical care constituting cruel and unusual punishment.

171.     The policies, practices and customs, promulgated, created, implemented and/or utilized by Defendant Derryberry represent the official policies and/or customs of County and/or Trust with regards to detainee health and safety.

172.     In the alternative, the policies, practices and customs, promulgated, created, implemented and/or utilized by Defendant County and/or Trust represent the official policies and/or customs of County and/or Trust with regards to detainee health and safety.

173.     Such policies, practices, and/or customs include, but are not limited to:

    a.   The failure to promulgate, implement, or enforce adequate policies responsive to the serious medical needs of detainees like Janway;

    b.   Inadequate medical triage screening that fails to identify detainees with serious medical or mental health needs;

    c.   Severe limitation or failure to utilize off-site medical, mental health, and diagnostic service providers, even in emergent situations;

    d.   Untimely medical and mental health examinations and treatment;

    e.   Untimely response to emergent medical or mental health crises;

    f.   Detention of severely physically ill, or mentally unstable detainees without medical attention.

174.    The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Derryberry (or in the alternative, Defendant County and/Trust), and thereby the official policies, practices, and/or customs of County and/or Trust, were the direct and proximate cause of Janway's deprivation of medical care which resulted in his pain, suffering and death.

175.    The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Derryberry (or in the alternative, Defendant County and/Trust), and thereby the official policies, practices, and/or customs of County and/or Trust, were the direct and proximate cause of Janway's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of his life, and all other damages alleged herein.

176.    Defendant Derryberry and/or Melson also failed to adequately train and/or supervise subordinates, including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Lyons and Laughlin, in relation to tasks they must perform pursuant to those policies, practices and/or customs outlined above.

177.    As noted previously, County and/or Trust delegated policy-making authority to Defendant Derryberry and therefore the training and supervision policies and/or customs adopted by Defendant Derryberry are the official policies and/or customs of County and/or Trust.

178.    In the alternative, County and/or Trust retained policy-making authority and therefore the training and supervision policies and/or customs adopted by Defendant County and/or Trust are the official policies and/or customs of County and/or Trust.

179.    Defendant Derryberry (and/or County/Trust) knew or should have known that jailers and medical staff, including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Lyons and/or Laughlin,

frequently encounter and/or detain individuals experiencing severe physical illness and/or mental health crises requiring emergency medical assistance.

180.    Defendant Derryberry (and/or County/Trust) knew or should have known that jailers, including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Lyons and/or Laughlin, frequently encounter and/or detain individuals at heightened risk of injury or death.

181.    Defendant Derryberry (and/or County/Trust) knew that jailers, under his exercise of control including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Lyons and/or Laughlin, require training and supervision in order to adequately identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of severe physical and/or mental health crisis.

182.    Defendant Derryberry (and/or County/Trust) knew that his failure to adequately train and/or supervise jailers under his exercise of control, including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Lyons and/or Laughlin, posed a substantial and excessive risk to the health and safety of Janway and would inevitably result in unconstitutional deprivation of medical care of the type that Janway suffered.

183.    Defendant Derryberry (and/or County/Trust)  failed to adequately train and/or supervise jailers, including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Lyons and/or Laughlin, in how to identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of severe physical illness and/or mental health crisis.

184.    Defendant Derryberry (and/or County/Trust)'s failure to train and/or supervise jailers, including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Lyons and/or Laughlin, exhibited deliberate disregard for the known and obvious excessive risk such policy and/or posed to Janway's health and safety.

185.    Defendant Derryberry (and/or County/Trust)'s failure to train and/or supervise jailers, including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Lyons and/or Laughlin, in reckless disregard to inevitable constitutional violations that would likely result constitutes the official policy and/or custom of County and/or Trust.

186.    Defendant Derryberry (and/or County/Trust)'s failure to train and/or supervise subordinate jailers, and thereby the official policies and/or custom of County and/or Trust, was the direct and proximate cause of Janway's deprivation of medical care which resulted in his death.

187.    Defendant Derryberry (and/or County/Trust)'s failure to train and/or supervise subordinate jailers, and thereby the official policies and/or custom of County and/or Trust, was the direct and proximate cause of Janway's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of his life, and all other damages alleged herein.

188.    There is an affirmative causal link between the aforementioned deliberate indifference to Janway's serious medical needs, health and safety (and violations of Janway's civil rights) and the policies, practices and/or customs described herein which Sheriff Derryberry promulgated, created, implemented and/or possessed responsibility for.

189.    Sheriff Derryberry knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of detainees like Janway. Nevertheless, Sheriff Derryberry failed to take reasonable steps to alleviate those risks in deliberate indifference to detainees', including Janway's, serious medical needs.

190.    Sheriff Derryberry tacitly encouraged, ratified, and/or approved of the unconstitutional acts and/or omissions alleged herein.

191.    There is an affirmative causal link between aforementioned. policies, practices and/or customs and Janway's injuries and damages as alleged herein.

## COUNT VI

## DELIBERATELY INDIFFERENT POLICIES, PRACTICES AND CUSTOMS, AND DELIBERATELY INDIFFERENT TRAINING AND SUPERVISION IN VIOLATION OF 42 U.S.C. § 1983 – STIGLER/HEALTH

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

192.    Stigler/Health are "persons" for purposes of 42 U.S.C. § 1983.

193.    Stigler/Health were endowed by County, Trust and/or Derryberry with powers or functions governmental in nature, such that Stigler/Health became an instrumentality of the State and subject to its constitutional limitations.

194.    In the alternative, Defendants County, Trust and/or Defendant Derryberry delegates final authority to establish municipal policy regarding detainee health and safety to Defendant Stigler and/or Health.

195.    Defendant Stigler/Health deprived Janway of rights and freedoms secured by the Fourteenth and Eighth Amendments of the U.S. Constitution—specifically freedom from deprivation of medical care constituting cruel and unusual punishment.

196.    Stigler/Health were charged with implementing and assisting in developing the policies of County, Trust, and/or Derryberry with respect to the medical and mental health care of detainees at the LCDC and have shared responsibility to adequately train and supervise their employees.

197.    The policies, practices and customs, promulgated, created, implemented and/or utilized by Defendant Stigler/Health represent the official policies and/or customs of County, Trust and/or Derryberry with regards to arrestee health and safety.

198.    There is an affirmative causal link between the aforementioned deliberate indifference to Janway's serious medical needs, health, and safety, and violations Janway's civil rights, and the below-described customs, policies, and/or practices carried out by Stigler/Health.

199.    Such policies, practices, and/or customs include, but are not limited to:

a.    The failure to promulgate, implement, or enforce adequate policies responsive to the serious medical needs of detainees like Janway;

b.    Inadequate medical triage screening that fails to identify detainees with serious medical or mental health needs;

    c.   Severe limitation or failure to utilize off-site medical, mental health, and diagnostic service providers, even in emergent situations;

    d.   Untimely medical and mental health examinations and treatment;

    e.   Untimely response to emergent medical or mental health crises;

    f.   Detention of severely intoxicated, physically ill or mentally unstable detainees without medical attention.

200.    The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Stigler/Health were promulgated, created, and/or utilized with conscious disregard of a substantial risk of serious harm and were the direct and proximate cause of Janway's deprivation of medical care which resulted in his death.

201.    The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Stigler/Health were promulgated, created, and/or utilized with conscious disregard of a substantial risk of serious harm and constitutional violations and were the direct and proximate cause of Janway's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of his life, and all other damages alleged herein.

202.    Stigler health knew, or **it** was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of detainees like Janway. Nevertheless, Stigler/Health failed to take reasonable steps to alleviate those risks in deliberate indifference to detainees', including Plaintiffs', serious medical needs.

203.    Stigler/Health tacitly encouraged, ratified, and/or approved of the unconstitutional acts and/or omissions alleged herein.

204.    Defendant Stigler/Health also failed to adequately train and/or supervise subordinates, including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Melson, Lyons and Laughlin, in relation to tasks they must perform pursuant to those policies, practices and/or customs outlined above.

205.     Defendant Stigler/Health knew that jailers and medical personnel, including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Melson, Lyons and Laughlin, frequently encounter, arrest, and/or detain individuals experiencing severe physical illness and/or mental health crises requiring emergency medical assistance.

206.     Defendant Stigler/Health knew that jailers and medical personnel, including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Melson, Lyons and Laughlin, frequently encounter and/or detain individuals at heightened risk of injury or death.

207.     Defendant Stigler/Health knew that jailers and medical personnel, under its exercise of control including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Melson, Lyons and Laughlin, require training and supervision in order to adequately identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of severe physical and/or mental health crisis.

208.     Defendant Stigler/Health knew o that its failure to adequately train and/or supervise jailers and medical personnel under its exercise of control, including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Melson, Lyons and Laughlin, posed a substantial and excessive risk to the health and safety of Janway and would inevitably result in unconstitutional deprivation of medical care of the type that Janway suffered.

209.     Defendant Stigler/Health failed to adequately train and/or supervise jailers and medical personnel, including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Melson, Lyons and Laughlin, in how to identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of severe physical illness and/or mental health crisis.

210.     Defendant Stigler/Health's failure to train and/or supervise jailers and medical personnel, including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Melson, Lyons and Laughlin, exhibited deliberate disregard for the known and obvious excessive risk such policy and/or posed to Janway's health and safety.

211.    Defendant Stigler/Health's failure to train and/or supervise jailers and medical personnel, including Defendants Deihl, Case, Tomlin, Lnu, Hasting, Melson, Lyons and Laughlin, in reckless and conscious disregard to inevitable constitutional violations that would likely result constitutes the official policy and/or custom of County, Trust and/or Derryberry.

212.    Defendant Stigler/Health's failure to train and/or supervise subordinate jailers and medical personnel was the direct and proximate cause of Janway's deprivation of medical care which resulted in his death.

213.    Defendant Stigler/Health's failure to train and/or supervise subordinate jailers and medical personnel was the direct and proximate cause of Janway's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of his life, and all other damages alleged herein.

## COUNT VII

## CONDITIONS OF CONFINEMENT

Plaintiff incorporates all previous allegations and statements and further alleges the following:

214.    Under the Eighth Amendment of the United States Constitution, inmates held in American prisons have a fundamental right to prison conditions that do not constitute "cruel and unusual punishment."

215.    In *Lopez v. LeMaster,* 172 F .3d 756 (10th Cir 1999), the Tenth Circuit held that a plaintiff states a claim for deliberate indifference against a county's legislative body by producing evidence from which a reasonable inference can be drawn that "county commissioners failed to provide funding for correction of deficiencies ... likely to lead to assaults against inmates." *Id.* at 763 ("Appellant has shown the requisite deliberate indifference ... there is evidence that the county's legislative body was itself deliberately indifferent to conditions at the jail.").

216.    Detainee and inmate living conditions must be reasonably sanitary and safe.

217.    At a minimum, prison officials must provide humane conditions of confinement and ensure that inmates receive adequate food, clothing, shelter, and medical care. They cannot deprive prisoners of the basic elements of hygiene or the minimal civilized measure of life's necessities.

218.    Oklahoma law requires every Board of County Commissioners in Oklahoma to provide a jail "for the safekeeping of prisoners lawfully committed." 57 Okla. Stat. § 41. This duty is constitutional as well as statutory. *See Bryson Oki. Cty. ex rel. Oki. Cty. Detention Center,* 26l P.3d 627, 637 (Okla. Civ. App. 2011). Also, "because the necessary maintenance of a jail is a constitutional duty, a county must first appropriate funds for such duty and any other constitutional duties before any county funds are expended for statutory duties or other functions." Okla. A.G. Opin., No. 07-35, 2007 WL 4699709 (Oct. 23, 2007).

219.    Contrary to this obligation, County, Trust and/or Derryberry routinely disregarded deficiencies at the LCDC that were obviously blow constitutionally acceptable standards, including but not limited to withholding food, water, and medications from physically and mentally ill detainees, subjecting detainees to cruel and unusual punishments such as leaving them in extremely cold showers until they become hyperthermic and unconscious, subjecting them to verbal and physical harassment and taunting, among other things.

220.    The conditions at the LCDC denied Janway basic elements of sustenance, hygiene and the minimal civilized measure of life's necessities. The result of those known conditions exposed Janway to a substantial risk of serious harm.

221.    The deplorable conditions were easily observable by Defendants and all Defendants were aware that the conditions imposed upon Janway denied him of his constitutional rights.

222.    No unforeseeable, exigent circumstances existed which would have prevented Defendants from mitigating the risks associated with Plaintiff's conditions of confinement.

223.    Yet, Defendants disregarded known unconstitutionally deficient conditions of confinement despite actual awareness of the substantial certainty of harm and damages such conditions were causing detainees, such as Janway.

## CAUSATION OF INJURIES AND DAMAGES

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

224.    The injuries and damages sustained by Janway, were produced in a natural and continuous sequence from Defendants' violation of one or more of the above described independent constitutional duties.

225.    The injuries and damages sustained by Janway were a probable consequence from Defendants' violation of one or more of the above described independent duties.

226.    Defendants should have foreseen and anticipated that a violation of one or more of the above-described independent duties would constitute an appreciable risk of harm to others, including Janway.

227.    If Defendants had not violated one or more of the above-described independent duties, then Janway's injuries, death, and other damages would not have occurred.

## AMOUNT OF DAMAGES

228.    The Plaintiff's injuries and damages are in excess of the amount required for diversity jurisdiction under 28 U.S.C. 1332 (currently $75,000.00), plus attorney fees, interest, costs and all such other and further relief for which should be awarded as judgment against Defendants in an amount to fully and fairly compensate Plaintiff for each and every element of damages that has been suffered.

## PUNITIVE DAMAGES

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

229. Plaintiff is entitled to punitive damages on claims brought against individual Defendants pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts, and omissions alleged herein constitute reckless or callous indifference to Janway's federally protected rights.

## DEMAND FOR JURY TRIAL

230. The Plaintiff demands a jury trial for all issues of fact presented by this action.

## RESERVATION OF ADDITIONAL CLAIMS

231. The Plaintiff reserves the right to plead further upon completion of discovery to state additional claims and to name additional parties to this action.

WHEREFORE, Plaintiff, Geneva Janway, as Personal Representative of the Estate of Aaron Janway, prays for judgment against Defendants in a sum excess of the amount required for diversity jurisdiction under 28 U.S.C. § 1332 (currently $75,000.00) plus interest, attorneys fee, costs, and all such other relief as to which Plaintiff may be entitled.

Respectfully submitted,

ATTORNEY LEIN CLAIMED

 s/Jason Hicks
Chris Hammons, OBA # 20233
Jason Hicks, OBA #22176
LAIRD, HAMMONS, LAIRD, PLLC
1332 S.W. 89th Street
Oklahoma City, OK 73159
Telephone:      (405) 703-4567
Facsimile:      (405) 703-4061
E-mail: jason@lhllaw.com
Attorney for Plaintiff